Peelle, J.,
concurring:
I concur in the conclusion of the court that there should be .a recovery against the United States for the several amounts found due by the experts, Slade and Bender, but in my view of the case that conclusion should be sustained upon the theory, or assumption, as the experts say, “ that' the United States was to pay the expense of removal ” of the Eastern Cherokees from their eastern home to the Indian Territory.
If the United States are so liable, then the defendants concede that the account as stated by Slade and Bender is correct.
The first and main question to be determined, therefore, is as to the liability of the United States, and it is conceded that if such liability exists it arose under the treaties of 1835-36 and 1846 (7 Stat. L., and 478, and 9 Stat. L., 871).
To interpret correctly the treaty of 1835-36 within the spirit of the decisions of the Supreme Court, it is essential to know how the Cherokee people understood the terms of the treaty and whether they had probable grounds for such understanding.
Practically from the beginning of the Government — to make room for white settlers — it was the policy of the United States to encourage the removal of the Indians domiciled in the Eastern States to the territory west of the Mississippi River. This policy is now manifest from the various trea *340 ties entered into by the United States with the several tribes (now a part of the history of the country) by which the Indians ceded their lands situate in the Eastern States to the Government and migrated to territory provided for them west of the. Mississippi River.
By the treaty of 1817 with the Cherokee Indians (7 Stat. L., 156), in furtherance of promises previously made by the President that those Indians who desired to continue the life of hunting instead of settling down to agriculture and civilized life, should have homes in the West on the waters of the Arkansas and White rivers (to which some of the Indians had migrated), it was provided in article 6, in addition to the compensation therein provided for the improvements left by them, that to aid in their removal the United States agreed “ to furnish flat-bottomed boats and provisions sufficient for that purpose. * * * The boats and provisions promised to the emigrants are to be furnished by the agent on the Tennessee River, at such time and place as the emigrants may notify him of; and it shall be his duty to furnish the same.”
By the treaty of 1828 with the Western Cherokees (7 Stat. L., 311) who had migrated to Arkansas Territory under the promise of the President and the treaties of 1817 and 1819, whereby the lands of the Western Cherokees in that Territory were exchanged for lands in the Indian Territory, the United States by article 8, to encourage the Cherokees residing East to join their brothers in the West, agreed in addition to giving them certain specified articles, to pay the cost of their emigration and to furnish them with provisions for their support on the way and provisions for twelve months after their arrival at the agency, and in addition thereto to give each person who took along with him four persons as emigrants and permanent settlers the sum of $150.
Thus, in addition to paying the expenses of removal and subsistence as there stated, the United States agreed, by way of encouraging them to induce others to migrate, to pay a bonus to each individual taking four such persons with him.
The treaty of 1833 (7 Stat. L., 414), as provided by article 5 thereof, was supplementary to the treaty of 1828 and *341 was “ not to vary the rights of -the parties to said treaty any further than said treaty is inconsistent with the provisions of this treaty, now concluded, or these articles of convention and agreement.”
It was not only the policy of the United States, as before stated, to encourage the removal of the Indians westward, but it ivas their policy to pay the expenses of their removal and their subsistence, as shown by the treaties with the Choctaws in 1820 (I Stats. L., 210) ; with the Creeks in 1826 (I Stats. L., 286) ; with the Chickasaws in 1832 .(7 Stats. L., 381) ; with the Seminóles in 1832 (7 Stats. L., 368), and with the Delawares and the Delawares and Shawnees in 1829 and. 1832 (7 Stats. L., 327 and 397). Can it be doubted that what was thus done was well known to the Cherokee Indians at the time of the treaty of 1835 ? Indeed, when a draft of the latter treaty was first submitted to them in general council at Red Clay, October 23, 1835, there was read and interpreted to them a letter from President Jackson in which, among other things, he said “ for the removal, at the expense of the United States, of your whole people; for their subsistence for a year after their arrival in their new country, and for a gratuity of $150 to each person.” (H. R. Docs., vol. 7, No. 286, p, 41, 24th Cong., 1st sess.)
And so the eighth article of the treaty of 1835 provided:
“ The United States also agree and stipulate to remove the Cherokees to their new homes and to subsist them one year after their arrival there and that a sufficient number of steamboats and baggage wagons shall be furnished to remove them comfortably, and so as not to endanger their health, and that a physician well supplied with medicines shall accompany each detachment of emigrants removed by the Government. Such persons and families as in the opinion of the emigrating agent are capable of subsisting and removing themselves shall be permitted to do so; and they shall be allowed in full for all claims for the same twenty dollars for each member of their family; and in lieu of their one year’s rations they shall be paid the sum of thirty-three dollars and thirty-three cents if they prefer it.
“ Such Cherokees also as reside at present out of the nation and shall remove with them in two years west of the Mississippi shall be entitled to allowance for removal and subsistence as above provided.”
*342 Up to this point, therefore, I take it there can be no well-grounded. controversy either as to what the Government had doneo respecting the cost of removal and subsistence of the various tribes of Indians theretofore removed to the Indian Territory, or as to what the purpose of the Government was by article 8 of the treat}*" of 1835 respecting the like expense of removing the Cherokees to the same Territory, i The language of the article will not bear the construction that the Government was advancing money to defray such expense or that the allowance therein provided to those capable of removing themselves was intended as a charge against the treat}* fund.
But for article 15 of the treaty it must be conceded that the Government had obligated itself to defray the cost of removal and subsistence, and this was' not only in conformity with what the Government had theretofore done respecting the removal of other Indian tribes, but was in conformity with the promise of the President made to the Indians in general council when a draft of the treaty was first submitted to them at Bed Clay some two months before, in substantially the same form in which it was finally signed at New Echota in the State of Georgia.
Now, keeping in mind what has been said respecting the understanding of the Cherokee people as to who was to pay the cost of their removal and subsistence, turn to article 15, which provides:
“Article 15. It is expressly understood and agreed between the parties to this treaty that after deducting the amount which shall be actually expended for.the payment for improvements, ferries, claims for spoliations, removal, subsistence, and debts, and claims upon the Cherokee Nation, and for the additional quantity of lands and goods for the poorer class of Cherokees and the several sums to be invested for the general national funds provided for in the several articles of this treaty, the balance, whatever the same may be, shall be equally divided between all the people belonging to the Cherokee Nation east, according to the census just completed; and such Cherokees as have removed west since June, 1833, who are entitled by the terms of their enrollment and removal to all the benefits resulting from the final treaty between the United States and the *343 Cherokees east, they shall also be paid for their improvements,- according to their approved value, before their removal, where fraud has not already been shown in their valuation.”
Between the provisions of that article and those of article 8, respecting the cost of removal, there is a conflict, and if the ordinary rules of construction applicable to contracts between individuals are enforced, then it must be conceded that the cost of removal was properly charged to the treaty fund. However, after this treaty had been signed, but before its ratification, a controversy arose as to whether the provisions of the treaty obligated the United States to pay the cost of removal, the Cherokee people insisting that the United States were so bound; and hence supplementary articles were entered into, which, so far as material to this case, are as follows :
“Aetiole 2. Whereas the Cherokee people have supposed that the sum of five millions of dollars, fixed by the Senate in their resolution of — day of March, 1835, as the value of the Cherokee lands and possessions east of the Mississippi Elver, was not intended to include the amount which may be required to remove them, nor the value of certain claims which many of their people had against citizens of the United States, which suggestion has.been confirmed by the opinion expressed to the War Department by some of the Senators who voted upon the question, and whereas the President is willing that this subject should be referred to the Senate for their consideration, and if it was not intended by the Senate that the above-mentioned sum of five millions of dollars should include the objects herein specified, that in that case such further provision should be made therefor-as might appear to the Senate to be just.
“Article 3. It is therefore agreed that the sum of six hundred thousand dollars shall be, and the same is hereby, allowed to the Cherokee people, to include the expense of their removal, and all claims of every nature and description against the Government of the United States not herein otherwise expressly provided for, and to be in lieu of the said reservations and preemptions and of the sum of three hundred thousand dollars for spoliations described in the first article of the above-mentioned treaty. This sum of six hundred thousand dollars shall be applied and distributed agreeably to the provisions of the said treaty, and any sur *344 plus which may remain after removal and payment of the claims so ascertained shall be turned over and belong to the education fund.
“ But it is expressly understood that the subject of this article is merely referred hereby, to the consideration of the Senate, and if they shall approve the same then this supplement shall remain part of the treaty.”
The Senate-agreed to the supplementary articles and the treaty as thus supplemented was ratified and subsequently promulgated. Thus the supposition of the Cherokee people that the United States were to bear the cost of removal was conceded by the Senate (which had fixed the value of their lands and possessions at $5,000,000) to be well founded, for upon the basis of the cost of removal, as stated in article 8, the sum agreed upon was thought to be sufficient, and if'it had been the controversy in that regard would have ended there. The allowance of $000,000 was not in the nature of a gratuity, but was in furtherance of a right which the Senate conceded.
The grounds for allowing the sum of'$600,000, as recited in the second supplementary article, were that the Cherokee people supposed that the sum of $5,000,000 so fixed by the Senate as the value of their lands and possessions “ was not intended to include the amount which may be required to remove them,” and in the third supplementary article it was “ therefore agreed that the sum of six hundred thousand dollars shall be, and the same is hereby, allowed to the Cherokee people to include the expense of their removal ” and certain other claims there stated. And it was therein expressly understood that if said article should be approved by the Senate, “ then this supplement shall remain part of the treaty.”
Inasmuch, therefore, as the basis of that allowance was the belief of the Cherokee people that the $5,000,000 fixed by the Senate as the value of their lands and possessions “ was not intended to include the amount which may be required to remove them, etc.,” I am of the opinion that the supplementary articles necessarily operated to modify article 15 by eliminating therefrom the word “ removal,” thereby harmonizing that article with article 8. Certain it is that when the Senate *345 ratified the supplementary articles allowing the sum of $600,000 which had been estimated as the amount necessary for the purpose stated, the practical effect was to eliminate from article 15 the word “ removal,” and such, I believe, was the intention of the parties from the language which they employed.
In the case of Cherokee Nation v. Georgia (5 Pet, 1, 15) the court, by Chief Justice Marshall, some four years before the treaty of 1835, in speaking of the controversy between the Cherokee Nation and the State of Georgia, said:
“ If courts were permitted to indulge their sympathies, a case better -calculated to excite them can scarcely be imagined. A people once numerous, powerful, and truly independent, found by our ancestors in the quiet and uncontrolled possession of an ample domain, gradually sinking beneath our superior policy, our arts, and our arms, have yielded their lands by successive treaties, each of which contains a solemn guaranty of the residue, until they retain no more of their formerly extensive territory than is deemed necessary to their comfortable subsistence. To preserve this remnant the present application is made.”
And further along in the same opinion, in referring to. the tribes which reside within the acknowledged boundaries of the United States, it is said:
“ They may more correctly, -perhaps, be denominated domestic dependent nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian.
“ They look to our Government for protection, rely upon its kindness and its power, appeal to it for relief to their Avants, and address the President as their great father.”
In the later case of Worcester v. Georgia (6 Pet., 515, 582), Mr. Justice Washington, in a concurring opinion, said:
"The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense."
*346 And such lias been the holding of our courts in dealing with the Indian tribes ever since. And especially should this rule prevail where the Indians sign a treaty by mark, as they did the treaty of 1835, and when' the terms of the treaty were made known to them only by the oral translation of an interpreter.
. Notwithstanding the Indians were required by the provisions of article 16 of that treaty to remove within two years, only a small minority migrated prior to 1837-38. But the expense of the removal and subsistence of that minority, together with the other expenditures chargeable thereto, nearly exhausted the $600,000 allowed by the third supplementary article, so that it became necessary to make a further appropriation to defray the expenses of removal and subsistence of those thereafter migrating. The expense of such removal and subsistence was estimated by the Secretary of War, and thereafter the Congress, by the act of June 12, 1838, appropriated the sum so estimated as“ in full of all objects in third article of supplementary articles of treaty of 1835 with the Cherokees; ” and in the same paragraph it was recited that “ No part of said money shall be deducted from the five million dollars stipulated to be paid to said tribe by said treaty.” If not to be so deducted, then it certainly follows that the United States were to pay the cost of such removal and subsistence ; not a part of it, but the whole of it.
Notwithstanding the provision thus made the Indians were, still opposed to removal, but when confronted with the military forces under General Scott, they fijially yielded and an arrangement was entered into whereby they were nearly all removed to the Indian Territory by the fall of 1838. The cost of this removal and subsistence largely exceeded $1,000,-000, and of the sum paid by the United States $1,111,284.70 was charged to the treaty fund; hence the cause of complaint.
Soon after their removal trouble arose between them and the Western Cherokees, as well as those Cherokees who had been signatory parties to the treaty of 1835 and had migrated thither prior to 1838. The Eastern Cherokees were by far the most numerous, and though they repudiated the treaty .of 1835 and charged that those who had entered into it *347 bad done so through corrupt motives, still they sought governmental control of the nation, which was resisted by the Western Cherokees, claiming that as the Eastern Cherokees had come into their territory without their consent and without payment for any portion of the lands, they should be subject to the rule of the Western Cherokees. But the Eastern Cherokees refused to be controlled by the minority. The result was that trouble arose and serious consequences were anticipated, if something was not speedily done to allay the ill feeling.
In 1838, in national convention assembled, the people comprising the Eastern and Western Cherokee nations were, by mutual agreement, united into one body politic under the style and title of the Cherokee Nation, and in that name it was agreed that all rights and titles to Cherokee public lands east or west of the Mississippi Ni ver, -together with all of their interests which may have vested in either branch of the Cherokee family, whether inherited or derived from any other source, should vest unimpaired in the Cherokee Nation.
Soon thereafter the reunited Cherokees adopted a constitution, declaring that the two branches had become reunited and that “ the lands of the Cherokee Nation should remain common property.”
• Such declared union, however, did not have the effect of allaying the difficulties between the two factions. Extreme measures were being resorted to by both factions to accomplish their ill-conceived purposes, and at the same time the Eastern Cherokees were claiming that the expense of their removal and subsistence should be borne by the United States.
These differences, bordering on bloodshed as between the two factions, and the increasing hostility of the Eastern Cherokees toward the United States for charging them with the cost of. removal and subsistence, led to the treaty of 1846 (9 Stat. L., 871). The preamble to that treaty recites that the purpose of the treaty was to effect a final and amicable, settlement of the claims in controversy between themselves and between them and the United States; and to that end it was in substance agreed that the lands occupied by the *348 Cherokee Nation should be secured to the whole people and that the United States should issue to them a patent for said lands; a general amnesty was declared in respect to all difficulties and disputes; that the Cherokees should be reimbursed for all claims made against them by the Uixited States and deducted from the $5,000,000 treaty fund; that the Western Cherokees should be reimbursed for the lands ceded by them by the treaty of 1828, out of the residuum of the. sums arising out of the treaty of 1835. That is to say, from the $5,600,000 granted by the treaty of 1835 there should be deducted the investments and expenditures stipulated in article 15 of said treaty, and out of the residuum there should be paid to the Western Cherokees a sum equal to one-third, to be distributed to them per capita, and that in arriving at that residuum there should be charged for removal only $20 per capita and for subsistence $33.33 per capita, as provided by article 8 of the treaty of 1835. By article 9 the United States agreed to make a “ fair and just settlement of all moneys due the Cherokees and subject to the per capita division under the treaty of 29th December, 1835, which said settlement shall exhibit all money properly expended under said treaty, and shall embrace all sums paid for improvements, ferries, spoliations, removal, and subsistence, and commutation therefor.” By article 11, in respect to the cost of removal and subsistence of the Eastern Cherokees under the treaty of 1835, it was agreed that the questions should be submitted to the Senate, by whose decision they agreed to abide.
In respect to the cost of subsistence the Senate decided that the United States should bear the expense, and there was accordingly restored to the treaty fund the sum of $189,422.76, but the provision requiring the Uixited States to pay the cost of removal xvas rejected by the Senate. The treaty as thus modified and ratified xvas acquiesced in by the Indians. But the delay of the Government in causing a fair and just settlement to be made of all moneys due the Indians under the treaty of 1835, which by the treaty of 1846 the Government had agreed to make, caused dissatisfaction among the Indians, and they petitioned Congress to carry out the provisions of the treaty.
*349 The account was finally stated by the Commissioner of Indian Affairs and on the basis of that report the Congress passed a joint resolution (9 Stat. L., 339) authorizing the accounting officers of the Treasury to make a just and fair settlement of the claims of the Cherokee, according to the principles of the treaty of 1846, and to make their report thereof at the next session of Congress, which was done, but no action was taken by Congress thereon. Later, however, by the act of February 27, 1851 (9 Stat. L., 573), Congress appropriated the sum of $724,603.37, with interest thereon af-ilie rate of 5 per cent per annum from June 12, 1838, until April 1, 1851. In the paragraph making the appropriation there was added this proviso:
“Provided, however, That the sum now appropriated shall be in full satisfaction and a*final settlement of all claims and demands whatsoever of the Cherokee Nation against the United States, under any treaty heretofore made with the Cherokees. And the said Cherokee Nation shall, on the payment of said sum of money, execute and deliver to the United States a full and final discharge for all claims and demands whatsoever on the United States, except for such annuities in money or specific articles of property as the United States may be bound by any treaty to pay to said Cherokee Nation; and except, also, such moneys and lands, if any, as the United States may hold in trust for said Cherokees: And frovided, further, That the money appropriated in this item shall be paid in strict conformity with the treaty with said Indians of sixth August, eighteen hundred and forty-six.”
In 1852, in conformity with the provision authorizing settlement to be made, the sum so appropriated, together with the further sum of $189,422.76 theretofore allowed for subsistence, making in all $912,026.13, was — though the Cherokee Nation entered its protest to the settlement on the basis proposed — paid to the Cherokees, for which a receipt was executed in full as provided in the act. Thus the long and persistent controversy between the Cherokee Nation and the United States was, notwithstanding said protest, supposed to be adjusted and settled as provided by the act.
If the matter had rested there the controversy between them would have been at an end, notwithstanding the pro *350 test of the Clierokee Nation. But on December 19, 1891, an agreement was entered into between the Government and the Cherokee Nation, by article 1 of which the Cherokee Nation agreed to cede to the United States 8,114,682.91 acres known as the Cherokee Outlet; and by article 2 it was agreed on behalf of the United States that for and in consideration of said cession the United States would (1) remove from the limits of the Cherokee Nation certain trespassers; (2) a certain article of the treaty of 1866 should be held for naught; (3) the judicial tribunals of the Cherokee Nation should have exclusive jurisdiction in certain cases; (4) “ The United States shall, without delay, render to the Cherokee Nation, through any agent appointed by authority of the national council, a complete-account of moneys due the Cherokee Nation under any of the treaties ratified in the years 1817, 1819,1825,1828, 1833, 1835-36, 1846, 1866, and 1868, and any laws passed by the Congress of the United States for the purpose of carrying such treaties, or any of them, into effect; and upon such accounting should the Cherokee Nation, by its national council, conclude and determine that such accounting is incorrect or unjust, then the Cherokee Nation shall have the right within twelve months to enter suit against the United States, in the Coxirt of Claims, with the right of appeal to the Supreme Court of the United States by either party, for any alleged or declared amounts of money promised but withheld by the United States from the Cherokee Nation, under any of said treaties or laws which may be claimed to be omitted from, or unfairly or unjustly or illegally adjusted in said accounting; and the Congress of the United States shall, at its next session, after such case shall be finally decided and certified to Congress according to law, appropriate a sufficient sum of money to pay such judgment to the Cherokee Nation, should judgment be rendered in her favor, or if it shall be found upon such accounting that any sum of money has been so withheld, the amount shall be duly appropriated bjr Congress, payable to the Cherokee Nation, upon the order of its national council; said appropriation to be made by Congress, if then in session, and if not, then at the next session immediately following such accounting;” (5) that certain *351 citizens of the Cherokee Nation should have the right to select lands as homesteads under certain conditions, and (6) that the United States should pay for said lands the sum of $8,300,000.
The other provisions of the treaty are not material to this case, but in transmitting the treaty the commissioners on the part of the United States reported to the President by way of explanation — doubtless to induce the ratification of the agreement — that in the relinquishment of the title to the land it was made a condition precedent that the United States should render to the Cherokee Nation a complete account of .moneys due to the Nation under treaties as stated in the fourth subdivision of article 2 above quoted, and this, they say, “ because the Cherokees are compelled to accept the construction of the treaties made by the executive and administrative branches of the Government,” and that “ whatever that construction is, the Indians must abide by it,” there being “ no appeal except to Congress.”. The commissioners also reported that the Indians “ claimed that upon a just accounting, upon a proper construction of the treaties named, a large sum of money, principal and interest, will be found due them; ” and that as the Government had kept the books and construed the treaties, no harm could come from restating the account, for if not theretofore correctly stated “ no possible reason can exist why the error should not be corrected.” (Senate Ex. Doc. 56, 52d Cong., 1st sess., pp. 11 and 12.)
The agreement so entered into was approved, by the Cherokee national council January 4, 1892, and ratified by the Congress by the act of March 3,1893 (27 Stat. L., 640). By the same act the sum of $5,000 was appropriated “ to enable the Commissioner of Indian Affairs, under the direction of the Secretary of the Interior, to employ such expert person or persons to properly render a conxplete account to the Cherokee Nation of moneys due said nation, as required in the fourth subdivision of article 2 of said agreement,” set out above.
Therefore, as part consideration and inducement for the sale of the land, the United States agreed that they would *352 without delay render “ a complete account of moneys due the Cherokee Nation; ” and, in furtherance, of the agreement and the appropriation therefor, such experts were appointed and an account was rendered, which was accepted by the Cherokee Nation, and its right to sue in this court was thereby waived.
The Cherolcees insisted upon the payment of the amount found due, but a question arose as to whether the experts had not exceeded their authority in so construing the treaties as to render the United States liable for the cost of the removal and then stating the account accordingly. It was contended then, and is now, that no question of law 'was submitted to them for decision; that they were merely to state the account as it existed, and this, it seems to me, is the correct view. The experts, however, in the account respecting the cost of removal, say:
“ The cost of removal and subsistence prove to be very much larger than was expected and provided for by the appropriation. The excess cost of subsistence over the amount appropriated has been refunded to the Cherokee Nation; but upon the assumption that the United States was (were) to pay the expense of removal there is due the Cherokee fund the sum of $1,111,284.70.”
That amount, it will be noted, is stated as due upon the assumption of the liability of the United States to pay the cost of removal. That liability the Congress desired determined, and for that purpose, in the act of July 1,1902 (32 Stat. L., 717), making provision for the allotment of land to the Cherokee Nation and for other purposes, section 68 was incorporated in these words:
“ Seo. 68. Jurisdiction is hereby conferred upon the Court of Claims to examine, consider, and adjudicate, with a right of appeal to the Supreme Court of the United States by any party in interest feeling aggrieved at the decision of the Court of Claims, any claim which the Cherokee tribe, or any band thereof, arising under treaty stipulations, may have against the United States, upon which suit shall be instituted within two years after the approval of this act; and also to examine, consider, and adjudicate any claim which the United States may have against said tribe, or any band thereof. The institution, prosecution, or defense, as the case *353 may be, on the part of the tribe or any band, of any such suit, shall be through attorneys employed and to be compensated in the manner prescribed in sections twenty-one hundred and three and twenty-one hundred and six, both inclusive, of the Eevisecl Statutes of the United States, the tribe acting through its principal chief in the employment of such attorneys, and the band acting through a committee recognized by the Secretary of the Interior. The Court of Claims shall have full authority, by proper orders and process, to make parties to any such suit all persons whose presence in the litigation it may deem necessary or proper to the final determination of the matter in controversy, and any such suit shall, on motion of either party, be advanced on the docket of either of said courts and be determined at the earliest practicable time.”
Under that act the Cherokee Nation filed the petition herein, claiming the several amounts stated in the account so rendered under the direction of the Secretary of the Interior as an award, and asked interest thereon at 5 per cent per annum from June 12, 1838. But doubts were enter-, tained as to whether under that act the Eastern Cherokees could be made parties to the action, and so by the act of March 3, 1903 (32 Stat. L., 996), making appropriation for the Indian Department, section 68 was amended as follows:
“ Section sixty-eight of the act of Congress entitled ‘An act to provide .for the allotment of lands of the Cherokee Nation, for the disposition of town sites therein, and for other purposes,’ approved July first, nineteen hundred and two, shall be so construed as to give the Eastern Cherokees, so called, including those in the Cherokee Nation and those who remained east of the Mississippi Eiver, acting together or as two ‘bodies, as they may be advised, the status of a band or bands, as the case may be, for all the purposes of said section: Provided, That the prosecution of such suit on the part of the Eastern Cherokees shall be through attorneys employed by their proper authorities, their compensation for expenses and services rendered in relation to such claim to be fixed by the Court of Claims upon the termination of such suit; and said section shall be further so construed as to require that both the Cherokee Nation and said Eastern Cherokees, so called, shall be made parties to any suit which may be instituted against the United States under said section upon the claim mentioned in House of Eepresentatives Executive Document Numbered Three liun- *354 clred and nine of the second session of the Fifty-seventh Congress; and if said claim shall be sustained in whole or in part the Court, of Claims, subject to the right of appeal named in said section, shall be authorized to render a judgment in favor of the rightful claimant, and also to determine as between the different claimants, to whom the judgment so rendered equitably belongs, either wholly or in part, and shall be required to determine whether, for the purpose of participating in said claim, the Cherokee Indians who remained east of the Mississippi River constitutes a part of the Cherokee Nation, or of the Eastern Cherokees, so called, as the case may be.”
Under the amended section the Eastern Cherokees appeared by counsel and filed their petition, claiming that they were entitled to the amount stated in the account so rendered under the direction of the Secretary of the Interior, for the cost of their removal to the Indian Territory, with interest thereon at 5 per centum from June 12, 1838. Still another class, known as Eastern and Emigrant Cherokees, appeared by counsel and filed their petition, in which they claimed one-fourth of the amount stated as the cost of removal of the Eastern Cherokees to the Indian Territory. Therefore, the Cherokee Nation, as well as the Eastern and all other Cherokees claiming any interest in the subject-matter of the litigation, appear to be in court as required by the jurisdictional act.
The claim thus referred to as “ mentioned in H. it. Executive Document No. 309 of the second session of the Fifty-seventh Congress,” is, as stated in the resolution of the House of Representatives, December 16, 1902, as follows: “ The award rendered under the Cherokee agreement of December 19, 1891, ratified by act of Congress approved March 3, 1893,” and more particularly set forth in H. R. Executive Document No. 182, Fifty-third Congress, third session, pages 1, 32, and the findings of fact of the Court of Claims of April 28, 1892, which latter are substantially the findings of fact in the present case.
The foregoing findings of fact were made and reported to Congress in response to the resolution of the United States Senate referring to the Court Senate bill No. 3681, provid *355 ing for- the payment of the award of the Secretary of the Interior in favor of the Cherokees under the provisions of the act of Congress of March 3,1893. But in the latter part of the ninth finding, referring to the report of the experts Slade and Bender as to the amount charged to the treaty fund, the court said: “ But whether said sum of one million one hundred and eleven thousand two hundred and eighty-four dollars and seventy cents ($1,111,284.70) was or was not improperly charged to the treaty fund, and whether interest should be allowed thereon are questions of law upon which the court expresses no opinion.”
Notwithstanding the report of the experts and the findings of the court were before the Congress, they did not see fit to make the appropriation to pay the amount found due, but instead referred the claim to the court for adjudication.
What, then, was referred to the court for adjudication? It is conceded in the court’s opinion that the amount found due has none of the elements of an award nor of an account stated, but that as the rendition of the account was made a part of the consideration for the sale of the Cherokee Outlet it is binding on the United States, and therefore the court can not go behind the account so rendered. That Congress did not take that view of the account is evident from their passage of the two acts conferring upon the court jurisdiction “ to examine, consider, and adjudicate * * * any claim which the Cherokee tribe, or any band thereof, arising under treaty stipulations, may have against the United States.” The agreement of 1891, ratified by the Congress, respecting the rendition o'f an account, is that “ The United States shall, without delay, render to the Cherokee Na-, tion * * * a complete account of moneys due the Cherokee Nation under any of the treaties ” therein referred to, and if the Cherokee council should “ determine that such accounting is incorrect or unjust,” the Cherokee' Nation should then have the-right, within twelve months, to enter suit in the Court of Claims against the United States. This it did not do, but instead accepted the account and thereby waived its right to sue. But were the United States bound to accept the account, based as it was upon the assumption *356 of their liability under the several treaties? I think not, for the reason that the questions of law involved were not submitted to the experts for their decision by the appropriation authorizing their appointment, nor will'the language of the agreement made the basis thereof bear such construction. The accounting contemplated by the agreement and for which the experts were appointed was a statement of the account as it actually existed between the United States and the Cherokee Nation; that is to say, to properly state the several claims of the Cherokee Nation and the payments made thereon by the United States. This they did not do, but upon the assumption of the liability of the United States to pay the cost of removal, stated a different account and the result was the balance of $1,111,284.70 in favor of the Cherokee Nation, so that in my view of "the case that question was left open by the experts for the court to deal with, but inasmuch as the Cherokee Nation accepted the account, though rendered upon the assumption of the liability of the United States, instead of bringing suit in the Court of Claims to have that question determined, it was left for the Congress to deal with, and hence the reference of the claim to-this court. The jurisdiction of the court to determine that question is not controverted.
In my view of the case, as before stated, the supplementary articles to the treaty of 1835 operated to modify article 15 thereof by eliminating therefrom the word “ removal ” and with that word eliminated the United States were liable under the treaty of 1835 for the expense of removing the Eastern Cherokees to the Indian Territory; and such was evidently the view of Congress by the act of June 12, 1838, making appropriation to pay the sum estimated by the Secretary of War as necessary to defray the expenses of removal and subsistence hereinbefore referred to, in which, in the same paragraph, it is recited that “ No part of said money shall be deducted from the five million dollars stipulated to be paid to said tribe by said treaty ” (1835). That language seems to justify the views I have expressed and may well be considered in its effect as a legislative construction of the treaty of 1835. In addition thereto Congress made appro *357 priations to pay the entire cost of subsisting the Cherokees for one year after their removal to the Indian Territory, notwithstanding the cost thereof, as stated in article 15 of the treaty of 1835, was to be deducted from the' treaty fund the same as the cost of removal.
I therefore reach the conclusion that the assumption of the experts, that the United States were liable for the cost of removal, was well founded, and that the amount found due by them upon that theory is correct, as conceded by the defendants.
The next question is, To whom should the money be paid ? It is conceded that the Cherokee Nation is entitled to recover under the treaty of 1819 and the treaty of 1866, and also certain interest under the act of Congress of March 3, 1893, the several sums set forth in the report of the experts, the disposition of each of which is correctly dealt with in the opinion of the court.
In respect to the sum of $1,111,284.70 for the expense of moving the Eastern Cherokees to the Indian Territory, that sum, if ;t had not been charged to the treaty fund, would, under the provisions of article 15 of the treaty of 1835, have been “ equally divided among all the people belonging to the. Cherokee Nation east, according to the census just completed,” while the ninth article of the treaty of 1846, after providing for deductions for money properly expended under the treaty of 1835, provides that:
“ The balance thus found to be due shall be paid over, per capita, in equal amounts, to all those individuals, heads of families, or their legal representatives, entitled to receive the same under the treaty of 1835 and the supplement of 1836, being all those Cherokees residing east at the date of said treaty and the supplement thereto.”
Hence whatever sums were properly chargeable under the treaty of 1835 were also chargeable under the ninth article of the treaty of 1846, and the balance remaining was to be equally -divided as above stated; while in respect to those Cherokees remaining east it was. expressly provided by article 10 of the treaty of 1846 — though they were not parties thereto — that nothing in said treaty “ shall be so construed *358 as in any manner to take away or abridge an}'' rights or claims which the Cherokees now residing in States east of the Mississippi River had, or may have, under the treaty of 1835 and the supplement thereto.”
But by article 4 of the treaty of 1846, it is provided, in respect of the Western Cherokees, that in consideration of the cession by them of their interest in the lands east and west of the Mississippi River, including the 8,000,000 acres ceded by the treaty of 1835 — all of which was to remain the common property of the whole Cherokee people — after all the investments and expenditures properly chargeable to the $5,600,000 granted by the treaty of 1835 had been deducted, that a sum equal to one-third part of said residuum should be distributed per capita to each individual of the Western Cherokees, and that in estimating the expense of removal and subsistence of the Eastern Cherokees the sum stipulated as commutation therefor in article 8 of the treaty of 1835 be adopted.
Inasmuch, therefore, as the cost of removal, $1,111,284.70, was charged to the treaty fund in the settlement thus made, the Cherokees, both east and west, received less than they would have received but for such deduction. Hence, when that sum is restored to the treaty fund the whole Cherokee people will be entitled to share in the sum so restored, the same as they would have been at the time of the treaty of 1846, plus whatever interest may now be added thereto.
The sum thus restored becomes a trust fund in the hands of the United States, not for the purpose of investment nor to be held by them, but for the sole purpose of distributing the same to the Cherokee people, as provided by the treaties of 1835 and 1846.
By Revised Statutes, section 1091, this court is inhibited from allowing interest on any claim “ unless upon a contract expressly stipulating for the payment of interest.” There is no provision in either of the treaties of 1835 or 1846 respecting the payment of interest, except on the specific sums to be invested as provided by the treaty of 1835, and the court must therefore look elsewhere for authority, if interest is to be allowed.
*359 No interest can be allowed on the sum under Revised Statutes, section 2096, as the same was not received under a treaty containing a stipulation for the payment of annual interest, but on the contrary was to be expended in defraying the cost of removal, etc. Nor can interest be allowed under Revised Statutes, section 2108, as the money is not going to incompetent or orphan Indians. Nor can interest be allowed under Revised Statutes, section 3659, as no interest has accrued thereon allowable by this court, nor has the same been invested in stocks of the United States or other interest-bearing securities.
As the act of February 27, 1851, supra, under which the settlement of 1852 was made, authorized the payment of interest from June 12, 1838, to April 1, 1851, on the sum appropriated, it may fairly be assumed that if the sum of $1,111,281.70 now in controversy had then been settled, interest would have been paid thereon as provided by the act. But that act has performed its office and the court can not look thereto for the payment of interest, even for the period stated, so that I have grave doubts as to whether there is any provision of law authorizing the court to allow interest on said sum, however much I may think it ought to be allowed; but for the purposes of this case I will assume the allowance of interest and the correctness of the distribution, as set forth in the court’s opinion.